RAMONA TORRES y OTROS, demandantes y apelados, *v.* HÉCTOR LUIS CASTILLO ALICEA, ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandados, apelante el Estado.

*Número:* O-81-447 *Resuelto:* 18 de diciembre de 1981

*Héctor A. Colón Cruz, Procurador General, y Américo Serra, Procurador General Auxiliar,* abogados del peticionario Estado Libre Asociado de Puerto Rico; *Sabino Cotto Cruz y Wilfredo Morales Rodríguez,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

La doctrina de inmunidad del estado trae raíz de una concepción jurídica que prevaleció entre los gobiernos absolutistas de los siglos diecisiete y dieciocho. En su choque con los sistemas políticos republicanos y pluralis-

tas, su influencia ha quedado reducida a la preservación contra litigios de aquellas áreas donde triunfa sobre el derecho individual irrestricto el mayor interés comunal en la realización de política pública de alto nivel y el ejercicio de fundamentales funciones de gobierno.

En Puerto Rico rige un estatuto general de consentimiento por el Estado que autoriza demandas en casos y bajo condiciones específicas, que es la Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. sec. 3077 y ss.) el cual sigue el patrón establecido por el Federal Tort Claims Act, 60 Stat. 812 *et seq.*, enmendado, mas apartándose de éste en aspectos fundamentales, nuestro estatuto fija un límite económico(1) a la compensación obtenible por sentencia judicial y mantiene una ingerencia continua de la Asamblea Legislativa en el proceso adjudicativo que se da lo mismo antes de iniciar la acción judicial mediante ley especial que suspenda los límites, o en intervención *post* sentencia con ley que autorice el pago de aquella parte de la misma en exceso del límite.

En el caso que ahora nos ocupa la Sala de Bayamón ha declarado inconstitucional la citada Ley Núm. 104 en su totalidad, y ha compensado daños en libre ejercicio de su facultad estimativa.

Para el 18 enero, 1975 Faustino Rodríguez Ríos de 56 años de edad trabajaba por contrato en resiembra de grama del frente de la residencia de Francisco Santiago Lavandero en la Urbanización Esperanza de Bayamón. El dueño de la casa y su esposa salieron como a las 5:00 P.M. y dejaron el portón de atrás abierto para que el jardinero tuviera acceso a una caseta donde podría cambiarse de ropa al terminar la jornada. A las 7:30 P.M. llegaron a la

---

(1) "Sec. 2674. Liability of United States

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. sec. 2674, Tomo 7, pág. 7673.

casa, que estaba totalmente oscura, el hijo de Santiago Lavandero con su esposa e hija, y al enfocar el jardín vieron al jardinero salir de entre los arbustos e infirieron que era un escalador, por lo que se trasladaron a otra residencia de parientes de la cual se llamó a la Policía. Ya el jardinero había terminado su labor y según instruido tomó su machete corto (daguita) y entró a la caseta de atrás a cambiarse cuando llegaron los policías Castillo Alicea y Rivera Colón y revólver en mano, sin linternas, penetraron al patio oscuro en dirección al cuarto o caseta alumbrado donde se hallaba el obrero, mientras los familiares interesados aguardaban en la acera el resultado de la operación. Desde allí afuera no veían la caseta. Lo que ocurrió entonces quedó cuestionado[2] por prueba contradictoria: el policía codemandado Castillo declaró que al acercarse fue atacado por el jardinero machete en mano y que él en defensa hizo un solo disparo que derribó a su antagonista, mientras la prueba de los demandantes, creída por el tribunal, estableció que su causante fue herido al abrir la puerta, sin hallarse en actitud de agredir a nadie. La juez dio especial relevancia al hecho de ser el guardia Castillo un agente bisoño con apenas un año de experiencia en la Policía. El único proyectil disparado perforó el hígado del obrero quien no salió del hospital, donde murió a los 109 días del triste suceso, al cabo de progresiva y penosa agravación de su condición crítica desde que fue ingresado. La viuda y siete hijos mayores de edad instaron acción civil de daños y perjuicios contra el policía Castillo Alicea, el Estado Libre Asociado, y el dueño de la casa Santiago Lavandero, en la que promueven la causal patrimonial o hereditaria reconocida en *Vda. de Delgado* v. *Boston Ins. Co.*, 101 D.P.R. 598 (1973)

---

[2] Al resolver el conflicto, la sala de instancia hubo de enfrentarse a la posibilidad real de que el jardinero confundiera a los agentes de orden con asaltantes según éstos y los familiares de su patrono le habían confundido a él con un ladrón.

y *Tropigas de P.R.* v. *Tribunal Superior,* 102 D.P.R. 630 (1974); y ejercitan la acción personal por lucro cesante y sufrimientos morales. Alegaron inconstitucionalidad de la Ley que autoriza pleitos contra el Estado y solicitaron sentencia por cantidades que exceden por mucho los límites de $15,000 y $30,000 señalados en dicha ley. El tribunal desestimó la reclamación de lucro cesante y en las restantes causales concedió daños por un total de $182,000 al considerar que en el acto generador de daño preponderó el elemento de negligencia sobre el criminal (*Galarza Soto* v. *E.L.A.*, 109 D.P.R. 179 (1979); *Morales Garay* v. *Roldán Coss*, 110 D.P.R. 701 (1981)), y decretó la inconstitucionalidad de toda la Ley Núm. 104 de 1955, en exceso de autoridad pues sólo se cuestiona la validez de sus Arts. 2(a) y (c) y 7. El Gobierno apeló y ahora resolvemos el recurso que quedó sometido el 20 octubre, 1981.

El diseño incorporado al estatuto general de inmunidad que autoriza acciones por daños contra el Estado (Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. sec. 3077 y ss.)) reparte el remedio provisto entre dos foros: el Tribunal General de Justicia y la Asamblea Legislativa. A tenor del Art. 2(a), 32 L.P.R.A. sec. 3077(a), los tribunales quedan autorizados a dictar sentencias efectivas hasta la suma de $15,000 por daños y perjuicios a la persona, o hasta $30,000 cuando la acción u omisión afectare a más de una persona, o en el caso de que sean varias las causas de acción a que tenga derecho un solo perjudicado. La misma limitación se impone por el inciso (c) a las acciones civiles "que se funden en la Constitución, o en cualquier ley de Puerto Rico, o en cualquier reglamento de algún departamento o división del Estado, o en algún contrato expreso o tácito con el Estado".[3] Por otro lado previene el Art. 7 de

---

[3] "Sec. 3077. Reclamaciones y acciones contra el Estado Libre Asociado— Autorización

"Se autoriza demandar al Estado Libre Asociado de Puerto Rico, ante el Tribunal de primera Instancia de Puerto Rico por las siguientes causas:

"(a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la

la Ley, 32 L.P.R.A. sec. 3082, que: "[p]ara ejercitar una causa de acción de las contenidas en los incisos (a) y (c) de la sec. 3077 de este título, por una suma mayor que la allí autorizada y para pagar el exceso de una sentencia sobre dichas sumas, será preciso obtener autorización legislativa específica".

■ La experiencia de la implementación de este estatuto de inmunidad en Puerto Rico es asaz ofensiva a la igual protección de los reclamantes y de irritante privilegio para un pequeño número de éstos que logra acción legislativa desprovista de unos criterios de elegibilidad que den a todos trato igual. A través de los años, la Asamblea

---

suma de $15,000 causados por acción u omisión de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia. Cuando por tal acción u omisión se causaren daños y perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder de la suma de $30,000. Si de las conclusiones del Tribunal surgiera que la suma de los daños causados a cada una de las personas excede de $30,000, el Tribunal procederá a distribuir dicha suma entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. Cuando se radique una acción contra el Estado por daños y perjuicios a la persona o a la propiedad, el Tribunal ordenará, mediante la publicación de edictos en un periódico de circulación general, que se notifique a todas las personas que pudieran tener interés común, que deberán comparecer ante el Tribunal, en la fecha dispuesta en los edictos, para que sean acumuladas a los fines de proceder a distribuir la cantidad de $30,000 entre los demandantes, según se provee en [las secs. 3077 a 3092 de este título].

"(b) . . . . . . . .

"(c) Acciones civiles en que la cuantía reclamada no exceda de $15,000 de principal, y que se funden en la Constitución, o en cualquier ley de Puerto Rico, o en cualquier reglamento de algún departamento o división del Estado, o en algún contrato expreso o tácito con el Estado." Art. 2.

"Sec. 3082.—Pago de sentencias; reclamaciones en exceso de sumas autorizadas

"El Estado satisfará prontamente cualquier fallo en su contra hasta el máximo señalado en la sec. 3077 de este título. Si se tratase del pago de una suma de dinero y no fuere posible hacerlo por no existir fondos a tal fin en el presupuesto corriente, se hará la correspondiente asignación de fondos para su pago en la parte del presupuesto general de gastos del siguiente año del departamento o agencia correspondiente. Para ejercitar una causa de acción de las contenidas en los incisos (a) y (c) de la sec. 3077 de este título, por una suma mayor que la allí autorizada y para pagar el exceso de una sentencia sobre dichas sumas, será preciso obtener autorización legislativa específica." Art. 7.

Legislativa, confrontada con una petición de reclamantes contra el Estado para que en consideración a la vasta dimensión de su pérdida, se les exima de los límites económicos de la Ley, viene otorgando una dispensa especial de la inmunidad y autorizando la demanda fuera de cuantía del estatuto general que regula los pleitos contra el Estado. (Ley Núm. 104 de 29 junio, 1955 (32 L.P.R.A. sec. 3077 y ss.)). Agrava el efecto discriminatorio la realidad de que esta dispensa legislativa se ha otorgado en ocasiones sin más trámite que una carta petición del interesado o de su abogado, pues no existe organismo llamado a evaluar la solicitud y hacer una determinación preliminar de existencia de causa de acción que pueda separar la validez jurídica[4] de la reclamación, de la simpatía o solidaridad que en toda persona de sensibilidad inspiran las grandes desgracias y los padecimientos catastróficos. Este tratamiento especial para unos afortunados ha sido justamente calificado como legislación de privilegio. *Rosario Cartagena* v. *E.L.A.*, 101 D.P.R. 620, 630 (1973). Súmese a esta situación de desigualdad la irrisoria indemnización a que el desarrollo de la economía ha reducido estos valores de 1955, pasados 26 años, que impide toda semblanza de adecuada compensación en un número sustancial de reclamaciones, pues se pierde toda proporción entre la gravedad del daño y la compensación disponible.

 Hasta ahora habíamos visto en los modestos límites económicos del estatuto un instrumento de protección del erario público contra reclamaciones gigantescas, mas la continuada práctica de dispensa especial por acción legislativa que vulnera el principio de igualdad y trato justo en la aplicación de las leyes, unida a la desvalorización de la moneda, al impulso de fuerzas inflacionarias a que hemos hecho referencia, nos insta a declarar el Art.

---

[4] No obstante, se ha resuelto que la causa de acción surge de aprobación de la ley especial que autoriza a demandar. *Valiente y Cía.* v. *Pueblo*, 71 D.P.R. 646, 648 (1950).

2(a) de la Ley Núm. 104 de 1955 citada, en contravención y conflicto con el Art. II, Sec. 7 de nuestra Constitución de 1952 en su categórica afirmación: "Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes." El vicio constitucional de la estructura nace de los límites económicos irreales que dan lugar a trato especial para algunos litigantes favorecidos por leyes de privilegio. El Estado puede limitar su responsabilidad civil al dar su consentimiento para ser demandado si dicha limitación guarda un justo balance entre el interés privado y el legítimo interés del Estado en proteger los recursos públicos y se provee igualdad en el acceso a la fuente de compensación. Como sostiene Prosser, es preferible que la pérdida causada por conducta negligente recaiga sobre el Gobierno, y no sobre la persona perjudicada; y que la negligencia de los empleados públicos debe propiamente considerarse, al igual que en otros casos de responsabilidad vicaria, como un costo administrativo del Gobierno que debe distribuirse entre el público mediante contribuciones.[5]

■ Una ley, o parte de la misma, que de su faz resista el escrutinio judicial de su validez, podrá guardar vicio de inconstitucionalidad si sus efectos, en la interacción con otra legislación en el amplio campo del ordenamiento legal, operan en detrimento y vulneración de derechos fundamentales de la persona.

■ El Art. 2(a) y (c) de la Ley Núm. 104 citada tiene un doble efecto impermisible: primero, niega a los demandantes en daños y perjuicios con reclamaciones mayores contra el Estado, mediante fijación de un límite económico arbitrario, la indemnización que corresponde a la magnitud de su pérdida; y segundo, coloca dichos demandantes en desigualdad con los que se benefician de legislación

[5] Prosser, *Torts*, 4ta ed., pág. 978.

especial que dispensa los límites económicos de $15,000 y $30,000, siguiendo un método que deja la eficacia de la decisión judicial a merced de aprobación por la Asamblea Legislativa.

En Puerto Rico ya hemos reconocido esta fórmula de impacto del estatuto sobre el derecho personal como norma de interpretación. "'La fórmula para la validez de un estatuto es lo que razonablemente puede hacerse de acuerdo con el mismo, y no lo que se ha hecho bajo dicho estatuto.'" *Banco Popular Liquidador* v. *Corte*, 63 D.P.R. 66, 81 (1944); no es forzoso concluir "que un precepto que viole una prohibición constitucional sea constitucional meramente porque el motivo de la Legislatura sea laudable, o porque la ley fuera de naturaleza general y uniforme en su aplicación o fuese adoptado como medida de economía para hacer frente a una situación inusitada. El objeto de una disposición constitucional es una cosa. Los medios a través de los cuales se logra ese objeto es otra". *Durand* v. *Sancho Bonet, Tesorero*, 50 D.P.R. 940, 943 (1937).

A la ley debe atribuírsele siempre el sentido que mejor responda a la realización del resultado que por ella se quiere obtener, y no aquél que además de ser contrario a ella, conduzca a un resultado ilógico. *García Commercial* v. *Srio. de Hacienda*, 80 D.P.R. 765 (1958). Debe evitarse el resultado irrazonable. *Colonos de Santa Juana* v. *Junta Azucarera*, 77 D.P.R. 392 (1954); *Lozada* v. *Antonio Roig, Sucrs.*, 73 D.P.R. 266 (1952).

Como doctrina general que gobierna esta situación expone el Prof. Laurence H. Tribe: "Las clasificaciones legislativas y administrativas deben someterse a escrutinio estricto y su inconstitucionalidad decretarse en ausencia de justificación gubernamental apremiante, si distribuyen beneficios o cargas de modo inconsistente con derechos fundamentales. A los fines de análisis de la igual

protección, las clasificaciones pueden crear inequidades con impacto sobre derechos fundamentales, de dos maneras:

"Primero, desigualdad respecto a una libertad, propiedad, u otro interés, como el interés en obtener un decreto judicial de divorcio, o en recibir beneficios de bienestar público, pueden estructurarse de tal modo que impida o penalice el ejercicio de un derecho que está independientemente protegido contra intervención gubernamental. . . . Segundo, y más intrínseco al concepto de igual protección, la desigualdad podrá menoscabar directamente el acceso a, o los niveles de un derecho considerado fundamental en el sentido específico de que desviaciones de la igualdad en su disponibilidad o disfrute son sospechosas. Estas desigualdades son particularmente lesivas cuando intervienen con cualquiera de las dos mayores fuentes de legitimidad política y legal, a saber, la franquicia electoral y la *acción civil*, o con el ejercicio de opciones personales de intimidad."[6] (Traducción y énfasis nuestros.)

Este Tribunal no se ha mostrado insensible a la desigualdad resultante del diseño legislativo que excluye un importante número de litigantes del beneficio del proyecto de ley que haga justicia a su reclamación dispensando el límite económico del estatuto general. Hemos declarado que los jueces deben determinar la cuantía de daños que resulte de acuerdo con la prueba, aun cuando pudiere dicha cuantía exceder de $15,000, y sobre el particular se ha resuelto que dictada una sentencia en contra del Estado en exceso de $15,000, a tenor de las disposiciones de las secs. 3077 a 3084 de este título, la parte a cuyo favor se hubiere dictado la misma puede obtener una autorización legislativa específica para que se le pague el exceso sobre dicho límite de $15,000. *Vda. de Valentín* v. *E.L.A.*, 84 D.P.R. 112, 122–123 (1961). Otra vez se deja la adjudicación final de justicia a la eventualidad de que

---

[6] *American Constitutional Law*, 1978, pág. 1002.

pueda el reclamante, colocado en el impredecible mar de los trámites legislativos, tener acceso a otras esferas de poder que no están necesariamente obligadas por el fallo judicial. La decisión en *Vda. de Valentín* v. *E.L.A.*, supra, es testimonio de la incapacidad de la Rama Judicial para hacer plena justicia en el caso sometido a su consideración. Es de todo punto insostenible, la validez de un esquema legislativo que por un lado reconoce y adjudica una reclamación, y por el otro difiere la validez y eficacia del fallo a lo que resuelva la Rama Legislativa. El resultado que brinda el sistema no es el obtenido en el tribunal, sino el que dicte la Asamblea Legislativa si el reclamante favorecido por la sentencia es también beneficiario de acción por la Legislatura.

El resultado es nefasto. La sentencia del tribunal que ha evaluado y adjudicado los derechos de las partes, permanecerá incumplida sujeta a que la Asamblea Legislativa le insufle energía ejecutiva. Es decir, que el fallo judicial dependerá para su virtud y eficacia de la acción de la Asamblea Legislativa, y aun así en la óptima posibilidad de que el demandante victorioso logre la intervención de la Rama Legislativa a su favor. En último análisis queda una sentencia judicial sujeta y condicionada en su valor a que otra rama del gobierno le imparta su aprobación, todo ello, en contravención del principio de separación de poderes. El hombre perjudicado frente al Gobierno en las condiciones que impone el estatuto general de inmunidad tiene derecho a una total y plena vindicación de su derecho en las cortes de justicia, sin sujeción a procedimientos ulteriores en la Asamblea Legislativa que plantean alternativas vulnerantes de fallo judicial.

Es patente la endeblez de este sistema legal que al repartir el foro de remedio entre Asamblea Legislativa y tribunal de justicia no es capaz de ofrecer un igual acceso de todo litigante a los procesos decisionales a que obligato-

riamente debe someterse para obtener una adjudicación de su acción civil.

Eliminado el límite compulsorio en la indemnización, queda ésta moderada por el arbitrio judicial que en cada caso habrá de estimar la intensidad del agravio y la motivación del autor del acto dañoso en la totalidad de factores determinantes de la cuantía de compensación, de modo que dentro del justo principio de reparación no adquiera ésta naturaleza punitiva contra toda la sociedad que ha de absorber el costo de la negligencia.[7] Bajo esta premisa deben modificarse por excesivas las partidas de compensación concedidas en instancia: la correspondiente a la causa de acción patrimonial o heredada, se reducirá de $75,000 a $35,000; y en las de causa de acción personal por sufrimiento moral, se reducirán de $20,000 a $15,000 la indemnización de la viuda Ramona Torres Rivas; de $15,000 a $10,000 la de Andrea Rodríguez Torres; y de $12,000 a $7,000 las de Gloria, Camila, Carmen, Ana y José Rodríguez Torres. Se revocará la concedida a Antonia Torres por no habérsele incluido en la determinación Núm. 21 sobre declaratoria de herederos sujeto a que el Tribunal Superior, si la omisión se debiere a error de forma, restituya su derecho a participación en la compensación global de origen patrimonial, y a la otra reducida de $12,000 a $7.000.

Toda vez que erró la sala de instancia al extender su decreto de inconstitucionalidad más allá de los Arts. 2(a) y (c) y 7 de la Ley, que son los que establecen límites económicos peculiares que contravienen la Constitución, también sufrirá modificación la sentencia en dicho extremo, y así modificada, será *confirmada.*

---

[7] Subsiste la advertencia de *Vda. de Valentín* v. *E.L.A.*, 84 D.P.R. 112, 123 (1961): "[E]ste menester de los Jueces debe estar presidido por un sano juicio y por criterios razonables y ponderados en la evaluación de cada caso, con objetividad de la realidad probada, de modo que siempre se conserve el sentido remediador del resarcimiento, que impone el artículo 1802 y el accidente no sea motivo de especulación o ganancia".

El Juez Asociado Señor Irizarry Yunqué está conforme y de acuerdo con la parte de la opinión que declara inconstitucionales los incisos (a) y (c) del Art. 2, y el Art. 7 de la Ley Núm. 104 de 29 de junio de 1955; y disiente de que se modifiquen las cuantías concedidas por el tribunal de instancia.

